IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEREK M. WILLIAMS,

                Plaintiff,

  v.                                                     OPINION and ORDER

LARRY FUCHS, KELLI WEST,
MARK TESLIK, DONNA MCMARTIN,                22-cv-396-jdp
and ASHLEY FREITAG,

                Defendants.

---

Plaintiff Derek Williams, proceeding without counsel, is a Muslim prisoner who was incarcerated at Columbia Correctional Institution (CCI) during the events relevant to this case. Williams alleges that prison officials burdened his religious practice by forcing him to either use open layout showers after recreation, which would require him to be naked around other men, or to forego showering after recreation entirely. Williams also alleges that the prison chaplain retaliated against him for complaining about the prison's Ramadan schedule. I granted Williams leave to proceed on First Amendment free exercise claims against all defendants and on First Amendment retaliation claims against the prison chaplain.

Defendants move for summary judgment on all of Williams's claims. Dkt. 33. I conclude that defendants have not violated Williams's right to freely exercise his religion because they had a legitimate reason to require inmates to use the open layout showers after recreation and to deny Williams a religious accommodation to shower privately. I also conclude that Williams has not adduced evidence that would support a retaliation claim, because none of the actions by the chaplain were severe enough to deter an ordinary inmate from making complaints. I will grant defendants' motion for summary judgment and dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted:

Plaintiff Derek Williams is a practicing Muslim who was incarcerated at Columbia Correctional Institution during the events giving rise to this case. Defendants were all Department of Corrections employees at the time. Defendant Larry Fuchs was the prison warden. Defendant Mark Teslik was a prison chaplain. Defendant Donna McMartin was the manager of Williams's unit at the prison. Defendant Ashley Freitag was a corrections program supervisor at the prison and was second in the chain of command for reviewing requests for religious accommodations. Defendant Kelli West was the religious practices coordinator for the Department of Corrections and chaired the Religious Practices Advisory Committee.

## A.  Recreational showers

The prison allows inmates to shower three times per week. Each unit has two private shower stalls with curtains. The prison also allows inmates to shower after recreation periods. The recreation area showers had an open layout, with a single shower tree in the middle with five or six shower heads spraying in different directions. Inmates had only twenty minutes to shower after recreation, so multiple inmates used the shower tree simultaneously.

Williams's religious beliefs forbid him from being naked around other men or seeing other men naked. Because of his beliefs, Williams didn't shower after recreation unless there were no other men in the recreation showers. Dkt. 32 (Williams Dep. 21:20–22:4). Williams asked defendants McMartin and Freitag for a religious accommodation to use the private on-unit showers after recreation instead of using the recreation showers. After conferring with defendants Teslik and West, Freitag told Williams that the institution could offer him three accommodations: (1) shower with boxer shorts on; (2) use privacy screens in the recreation

2

showers; or (3) wait to shower until his unit's next designated shower day. The privacy screens that Freitag referred to were large plastic rectangles. An inmate could place two privacy screens on either side of the shower tree to form a triangle with the wall of the shower, which would block the inmate's body from approximately the knees to the chest.

Williams was unsatisfied with the offered accommodations, so he submitted a religious accommodation request asking to shower privately after recreation. He also submitted an inmate complaint about being denied religious shower exceptions, which defendant Fuchs denied because the request was already being reviewed through the religious accommodations process. Williams was transferred out of the prison before the accommodations review process was completed, although the Department of Corrections Religious Practices Advisory Committee ultimately recommended denying Williams's request.

**B. Jumu'ah services and alleged retaliation**

In 2021, the prison offered two Friday Jumu'ah services: one at 12:45 p.m and one at 1:30 p.m. Inmates were assigned to one of the two services to maintain COVID-19 protocols on the size of group gatherings. Williams was regularly scheduled for the first Jumu'ah service. Williams believed that only this first service was a true Jumu'ah service because the second service either did not occur at the appropriate time or did not have enough Muslims in attendance. Outside volunteers were not allowed in the prison in 2021 due to COVID-19, so Williams and a few other inmates took turns reading a pre-approved Khutbah to the group during Jumu'ah.

On April 9, 2021, Williams and Teslik had a disagreement during Jumu'ah about that year's Ramadan schedule. Williams and the defendants describe this disagreement differently, but the bottom line is that Williams complained that the Ramadan schedule listed the wrong

times for sunrise and sunset, and that Williams ultimately left Jumu'ah early. Later that day, Williams met with Teslik and McMartin about what had occurred during Jumu'ah. Williams again expressed his concerns about the Ramadan schedule and mentioned that there were gang members at Jumu'ah. Williams says that Teslik responded to Williams's mention of gang members by telling him, "how about we make them aware you have a problem with them." Dkt. 52, ¶ 69. Defendants deny that Teslik said this.

Two weeks after the April 9 incident, Williams was switched from the first Jumu'ah service to the second one. In addition to changing his Jumu'ah service time, Williams says that Teslik's behavior toward him changed after the April 9 incident. Teslik began acting rudely toward Williams, including throwing his Qur'an on a desk and standing over him while he was praying. He also prevented Williams from speaking with Muslim volunteers at Jumu'ah about his upcoming marriage, though he allowed Williams to speak with volunteers about that topic at other times.

## ANALYSIS

**A. Free exercise claim**

Williams contends that defendants violated his First Amendment right to freely exercise his religion by not allowing him to shower privately immediately after recreation. To survive the motion for summary judgment on his free-exercise claim, Williams must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citation omitted). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450

4

U.S. 707, 718 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Under *Turner*, the court must consider four factors in determining whether a restriction is reasonably related to legitimate penological interests: (1) the existence of a "valid, rational connection" between the restriction and a legitimate, neutral government interest; (2) the existence of alternative methods for the inmate to exercise his constitutional right; (3) the effect the inmate's assertion of his religious right will have on the operation of the facility; and (4) whether there is an obvious, easy alternative method to satisfy the government's legitimate interest. 482 U.S. at 89–91. The first factor is often viewed as a "threshold" factor that can be dispositive for either party. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). In evaluating whether there is a valid, rational connection between a restriction and the government's legitimate penological interests, the initial burden of proof rests on the defendant government officials. *Id.* at 536–37. Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to the plaintiff to present evidence undermining the state officials' explanation. *Id.*

For the first factor, the restriction Williams challenges is the prison's requirement that inmates who want to shower after recreation use the open layout recreation showers rather than the private on-unit showers. Defendants say that the reason for this restriction was efficiency. As Williams admits, there were often 20 to 30 inmates who wanted to shower after recreation. Dkt. 32 (Williams Dep. 22:25–23:2). All of them could shower in 20 minutes in the recreation showers. But there were only two private shower stalls in each housing unit, so inmates showering there after recreation would have had to take turns, which would have taken

5

more time and staff resources. Efficiency is a legitimate interest within the prison setting. *See Lindell v. Frank*, 377 F.3d 655, 659 (7th Cir. 2004); *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007). The prison's recreation shower policy promoted that interest by allowing dozens of inmates to shower in a short period of time.

Williams contends that defendants' asserted concern for efficiency is false because the prison converted one of its open layout recreation showers to private stalls in 2022 in response to a Prison Rape Elimination Act (PREA) audit. Dkt. 45, at 8. But the prison's decision to change the shower layout does not undermine defendants' assertion that, before the layout was changed, it was more efficient to give inmates 20 minutes to use the open layout showers as opposed to cycling inmates one-by-one through two on-unit private showers. Defendants have rationally connected the prison's recreation shower policy with the prison's legitimate interest in efficiency. The first factor favors defendants.

The second factor asks whether Williams had alternative methods to practice his religion. This is where defendants' proposed accommodations come in. Defendants offered Williams three options to maintain his privacy in accordance with his religious beliefs: (1) shower with boxer shorts on; (2) use privacy screens; or (3) wait to shower until his unit's next designated shower day.

Williams has adduced evidence that the first two options were not viable alternatives. He says that his boxer shorts became transparent when wet, so they would not give him the modesty that he needs. As for the privacy screens, Williams says that they were frequently not available in the recreation showers, and that even when they were available, the privacy screens blocked the entire shower tree, so they were impossible to use without causing confrontations with other inmates who were also trying to shower. Boxer shorts and privacy screens also

6

wouldn't have prevented Williams from seeing other men naked in the recreation showers, which he states also violates his religious beliefs. At summary judgment, I must construe any genuinely disputed facts in Williams's favor, so I conclude that these two options were not viable alternatives for Williams to maintain his privacy in accordance with his religious beliefs.

But the problem for Williams is that he doesn't address the viability of the third option: waiting to shower until his unit's next designated shower day. The opportunity for private on-unit showers was provided three times per week, so Williams would have had to wait at most one to two days to shower. Williams admitted in his deposition that this is the option he actually used. He stated that he did not shower after recreation unless there were no other men using the showers, which almost never happened. Dkt. 32 (Williams Dep. 21:20–22:4).

I recognize that the third option was not a perfect solution for Williams: in essence, defendants required him to choose among violating his religious beliefs, limiting his recreation activities, or getting clean immediately after recreation. But the question under the second factor isn't whether Williams had the perfect solution to practice his religion unburdened, but whether he was deprived of "all forms of religious exercise." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 352 (1987). Here, not only did the prison allow Williams to practice his religion in numerous ways, including attending religious services, reading religious texts, and observing Ramadan, but it also allowed him to maintain his modesty specifically with regard to showers, as long as he was willing to wait until his unit's next designated shower day. I am not aware of any judicial decision holding that requiring an inmate to wait a few days between showers would violate his Eighth Amendment rights. So I conclude that waiting was a viable alternative that fully preserved Williams's religious exercise with a modest compromise to his hygiene needs. The second factor favors defendants.

7

The third and fourth factors ask, essentially, how the prison would handle exceptions to its general policy requiring inmates to use the open layout showers after recreation. This is where Williams's preferred accommodation comes in: he wanted the prison to give him an individual exception to shower on-unit immediately after recreation. He asserts that this was a feasible option because the prison already gave such exceptions to transgender and intersex inmates, so it would have been no great burden for the prison to give him an exception as well.

Williams is right that the accommodation of transgender and intersex inmates shows that it would not have been impossible to provide a private post-recreation shower for a small number of inmates. But the prison provided private showers to transgender and intersex inmates because of PREA requirements. A private shower is generally desirable comfort, and given the shower tree configuration at the time, it would have been impractical to provide that accommodation to a large number of inmates immediately after recreation. I conclude that excluding inmates from private post-recreation showers—except where required by PREA for transgender and intersex inmates—was a reasonable decision motivated by prison-management concerns. The third and fourth factors favor defendants.

In sum, the prison had a legitimate reason to require inmates to use the open showers in the recreation areas. And Williams had a reasonable way to maintain his privacy in accordance with his religious beliefs: he could wait to shower until his unit's next designated shower day. I conclude that Williams has not shown a violation of his right to freely exercise his religion.

Further, even if Williams had met his burden of showing a violation of his free-exercise rights, defendants would be entitled to qualified immunity on any claim for damages. That doctrine shields officials from civil liability so long as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). Williams does not cite, nor have I found, any binding authority holding that inmates have a clearly established religious right to shower privately after recreation. I will grant summary judgment to defendants on Williams's free-exercise claims.

## B. Retaliation

I granted Williams leave to proceed on a First Amendment retaliation claim that defendant Teslik retaliated against him for complaining that the Ramadan schedule was inaccurate. Williams alleges five actions that Teslik took to retaliate against him:

- rescheduling Williams from the first Jumu'ah service to the second one, which Williams believed was not a true Jumu'ah service;
- looking through Williams's Qur'an and throwing it down on a desk;
- standing over Williams while Williams was sitting on the floor on a prayer rug;
- telling Williams that he could not speak with the Muslim volunteer during Jumu'ah about his upcoming marriage; and
- threatening to tell gang members that Williams had a problem with them.[1]

To establish a First Amendment retaliation claim, Williams must adduce evidence that (1) he engaged in activity protected by the First Amendment; (2) Teslik took actions that

---

[1] Williams also brought free-exercise claims related to some of this conduct. Specifically, he alleged that Teslik's changing his Jumu'ah time and threatening to tell gang members that Williams had a problem with them prevented him from practicing his religion. But I dismissed Williams's free exercise claims for failure to exhaust administrative remedies. Dkt. 28. Williams had complained to the prison only that Teslik had retaliated against him for his complaints about the Ramadan schedule. I decided that his complaint did not put defendants on notice that Teslik's actions had burdened his religious practice. *Id.*

9

would deter a prisoner of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in Teslik's decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). I will grant summary judgment to defendants because, even assuming that Williams's complaints about the Ramadan schedule were protected, none of Teslik's allegedly retaliatory actions were serious enough to deter an inmate of ordinary firmness from making complaints.

"Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact," but I can resolve it at summary judgment if the asserted injury is "truly minimal." *Douglas v. Reeves*, 964 F.3d 643 (7th Cir. 2020). Physical violence, actions that threaten an inmate's safety, or deprivations such as solitary confinement are sufficiently severe to support a retaliation claim, but "simple verbal harassment" or minor inconveniences are not. *See Streckenbach v. Meisner*, 768 F. App'x 565 (7th Cir. 2019); *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016).

The first action Williams alleges is that Teslik switched him from the first Jumu'ah service to the second one, which Williams believed was not a true Jumu'ah service because it did not take place at the right time and there were not always enough Muslims present. *Holleman v. Zatecky* is on point. 951 F.3d 873 (7th Cir. 2020). In that case, the court of appeals held that transferring an inmate from one prison to another prison with the same level of security was not an adverse action for the purpose of a retaliation claim. *Id.* at 881. The inmate argued that he had to share a cell in the new prison, that he was allowed fewer hours in the law library, and that the transfer upset his accustomed lifestyle and deprived him of a familiar environment. *Id.* But the court rejected these as minor inconveniences, holding that "[w]ithout some additional aggravating factor, such as relocation to a much more restrictive or dangerous

10

environment, a transfer is not likely to deter a person of ordinary firmness from continuing to engage in protected conduct." *Id.* at 882. Here, Williams was transferred from one Jumu'ah service to a second, similar service that occurred 45 minutes later. Like the plaintiff in *Holleman*, he provided reasons why he preferred the first service, but he adduced nothing that would allow a reasonable jury to find that the second service was so inferior that transfer to that service would deter an ordinary inmate from engaging in protected conduct.

The other actions Williams alleges also fail to support a retaliation claim, because none of them are more serious than simple verbal harassment or minor inconveniences. Williams alleges that Teslik stood over him in an intimidating manner while he was praying, and that he looked through Williams's Qur'an and threw it on a desk. These actions may have been rude, but rudeness is not enough to make out a retaliation claim. And as for Teslik's telling Williams that he couldn't discuss his upcoming marriage with Muslim volunteers at Jumu'ah, this was nothing more than a minor inconvenience because Williams admits that Teslik allowed him to discuss his marriage with the volunteers at other times. Dkt. 52, ¶ 78. Teslik's actions may have been frustrating to Williams, but they did not threaten Williams's safety or deprive him of anything. No reasonable jury could find that these actions would deter an inmate of ordinary firmness from making complaints.

Williams's strongest potential retaliation claim is that, during his conversation with McMartin and Teslik, Teslik threatened him by saying, "how about we make them aware you have a problem with them," referring to gang members. Threats can be severe enough to deter an inmate of ordinary firmness from engaging in protected activity, but there generally must be an aggravating factor that raises the threat above simple verbal harassment, such as a specific threat of death or serious bodily harm, a follow-up action, a pattern of abuse, or a threat made

11

in front of other inmates in a way that threatens an inmate's safety. *See, e.g., Streckenbach*, 768 F. App'x at 569 (calling an inmate a "snitch" in front of other inmates); *Hughes*, 816 F.3d 955 (7th Cir. 2016) (threats made as part of a pattern of abuse). Without an aggravating factor, vaguely threatening statements fall into the same category as simple verbal harassment and are not enough to support a retaliation claim. *Antoine v. Uchtman*, 275 F. App'x 539 (7th Cir. 2008); *Long v. Hammer*, 727 F. App'x 215 (7th Cir. 2018). Even construed in Williams's favor, the evidence shows only that Teslik made a single, vaguely threatening statement during a private conversation with Williams and McMartin, and that he never brought it up again or followed through in any way. There is no aggravating factor here that would allow a reasonable jury to find that this was more than simple verbal harassment.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 33, is GRANTED.
2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered June 25, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge